JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

SEAN BASINSKI,

                            Plaintiff,

    -v-

THE CITY OF NEW YORK, New York City Police
Department Police Officer ("P.O.") ROBERT BROWNE
(Shield No. 3196) and Lieutenant ("Lt.") JOHN COCCHI,
in their individual capacities,

                            Defendants.

------------------------------------------------------------------x

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

Index No. 14-CV-



14 CV 1057

Plaintiff SEAN BASINSKI, through his attorney DAVID B. RANKIN of Rankin & Taylor, PLLC as and for his complaint, does hereby state and allege:

### PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff SEAN BASINSKI's rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal arrested Mr. BASINSKI for using his cell phone to record an officer. By reason of defendants' actions, including their unreasonable and unlawful seizure of his person, he was deprived of his constitutional rights.

3. Plaintiff seeks an award of compensatory damages, punitive damages, and attorneys' fees.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that plaintiff's claim arose in the Southern District of New York.

6. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

## PARTIES

7. Plaintiff SEAN BASINSKI ("BASINSKI") was at all times relevant to this action a resident of the County of New York in the State of New York. Mr. BASINSKI is an attorney who regularly practices before this Court. He is also the founder and director of the Street Vendor Project, a member-based advocacy group for vendors' rights at the Urban Justice Center.

8. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

9. NYPD POLICE OFFICER ("P.O.") ROBERT BROWNE (Shield No. 3196) "BROWNE," NYPD LIEUTENANT ("Lt.") JOHN COCCHI "COCCHI" (herein after "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

10. The individual defendants are being sued herein in their individual capacities.

2

11. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

## STATEMENT OF FACTS

12. On September 19, 2013 at or about 12:45 p.m., Mr. BASINSKI was falsely arrested by P.O. BROWNE in front of or about the vicinity of 306 West 54th Street, in the County and State of New York.

13. At the time place and location referenced above, Mr. BASINSKI, an attorney who is the founder of the Urban Justice Center's Street Vendor Project, was standing on the sidewalk near the front of the Midtown North Police Precinct, speaking to a street vendor who was waiting for P.O. BROWNE to issue him a summons.

14. Mr. BASINSKI was standing on the edge of the sidewalk closest to the street, in an area not utilized by pedestrians, because passage is blocked by garbage and parked police vehicles from the Midtown North Precinct.

15. Mr. BASINSKI utilized his cell phone to record the interaction between P.O. BROWNE and the street vendor who was receiving a summons.

16. While recording the interaction, Mr. BASINSKI did not obstruct P.O. BROWNE's access to the vendor or otherwise interfere with his duties, though he did verbally assert his First Amendment protected right to continue to monitor the interaction.

17. Then, P.O. BROWNE at the direction of Lt. COCCHI, handcuffed and arrested Mr. BASINSKI.

18. P.O. BROWNE and Lt. COCCHI arrested Mr. BASINSKI because of the implicate criticism of his comments to P.O. BROWNE.

19. P.O. BROWNE mendaciously swore on a criminal complaint, under the penalties of perjury, that Mr. BASINSKI was blocking his path and was preventing him from issuing a summons.

20. Mr. BASINSKI spent approximately 24 hours in the defendants' custody as a result of his arrest.

21. Mr. BASINSKI was charged with Obstructing Governmental Administration in the Second Degree and Disorderly Conduct (for purportedly obstructing vehicular or pedestrian traffic).

22. His charges were adjourned in contemplation of dismissal.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
(Against all Defendants)

23. Mr. BASINSKI incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

24. At all times relevant herein, Mr. BASINSKI was standing on the sidewalk and not interfering with P.O. BROWNE or obstructing pedestrian traffic. His recording of P.O. BROWNE and his speech to P.O. BROWNE was obviously protected by the First Amendment, and no reasonably competent police officer would believe otherwise.

25. Indeed, the Supreme Court has recognized that "[t]he First Amendment protects a significant amount of verbal criticism and challenge *directed at* police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1997) (emphasis added).

26. Apparently because P.O. BROWNE and Lt. COCCHI found Mr. BASINSKI's assertion of his right to observe the police to be offensive, the officers retaliated against him by arresting him and causing him to be prosecuted on charges based on P.O. BROWNE's knowingly false statements.

27. In so doing, P.O. BROWNE and Lt. COCCHI, under color of state law, deprived Mr. BASINSKI of his rights, privileges and immunities secured by the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, including but not limited to deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of her person, including but not limited to false arrest and false imprisonment; (b) freedom from interference with activity protected by the First Amendment; (c) freedom from retaliatory arrest; (d) freedom from retaliatory prosecution; and (e) freedom from abuse of process.

28. P.O. BROWNE's and Lt. COCCHI's deprivation of Mr. BASINSKI's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983
(Against the City of New York)

29. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

30. P.O. BROWNE's and Lt. COCCHI's acts and omissions described above were carried out pursuant to the CITY's overlapping customs and practices which were in existence on September 19, 2013 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the CITY and its agency, the NYPD.

31. The acts complained of were carried out by P.O. BROWNE and Lt. COCCHI in their capacities as police officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

32. The aforementioned custom and practice of the CITY and the NYPD include, but are not limited to,

   a. Applying an unconstitutionally vague and speech-restrictive interpretation of Penal Law § 240.20(5), disorderly conduct by blocking vehicular or pedestrian traffic, when arresting persons are engaged in activity protected by the First Amendment, even where the alleged blockage of traffic is either brief and fleeting or entirely non-existent; and

   b. Failing to supervise, train, instruct and discipline police officers about the lawful scope of Penal Law § 240.20(5), both on its face and as applied to activity protected by the First Amendment.

   c. Making retaliatory arrests against persons who lawfully photograph, document or record police activity;

   d. Arresting persons known to be innocent where such persons are engaged in activity protected by the First Amendment and/or the consent decree Black v. Codd;

   e. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony in order to chill or obstruct persons from lawfully observing arrests of persons in public;

33. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

   a. Lambert v. City of New York, 153046/12 (Sup. Ct., N.Y. Co). The plaintiff in *Lambert* was lawfully participating in a demonstration associated with the Occupy Wall Street movement when she heard an order to disperse. She attempted to comply with the order by finding the nearest point of exit, but, when none could be easily found, and when NYPD officers refused to answer her questions about which direction she should go to comply with the order, NYPD officers placed her under arrest and caused her to be charged with N.Y. Penal Law § 240.20(5).

   b. Coleman v. City of New York, 12-CV-2123 (DAB) (HP) (S.D.N.Y.). The plaintiff in *Coleman* was participating in five-minute long, site-specific work of performance art intended as a commentary on the various occupations found around Wall Street,

6

entitled "Ocularpation: Wall Street." At approximately 7:00 a.m. on a weekday in the financial district, long before the sidewalks became crowded with workers, Coleman took off her shirt and began pretending to walk a dog as part of the performance. Despite the fact there were absolutely no pedestrians on the sidewalk to be blocked, officers arrested her and charged under Penal Law § 240.20(5), charges which were dismissed as being facially insufficient to support the charge.

c. <u>Halfmann v. City of New York</u>, 12-CV-1403 (PAC) (S.D.N.Y.). The plaintiff in *Halfmann* was demonstrating blocks from the World Trade Center on the tenth anniversary of the attacks of September 11, 2001. During the memorial ceremony, Halfmann stood in the middle of Church Avenue, which at that time was turned into a pedestrian walkway. While occupying approximately 2.8% of the usable pedestrian path, Halfmann began giving a speech to passersby. During the speech, pedestrian traffic flowed free past Halfmann; absolutely no one had to walk around Halfmann to avoid walking into him. Nevertheless, officers approached and arrested him for violating Penal Law §240.20(5), a charge that was dismissed as facially insufficient to sustain a prosecution.

d. <u>Garcia v. Bloomberg</u>, 11-CV-6957 (JSR) (S.D.N.Y.). The *Garcia* plaintiffs represent a putative class of approximately 700 people arrested on the Brooklyn Bridge roadway as part of a march associated with the Occupy Wall Street movement. As the demonstrators marched over the pedestrian path of the Brooklyn Bridge, pedestrian traffic began to bottleneck near the entrance. In what initially appeared to be an effort to alleviate the bottleneck, NYPD officers led a group of marchers onto the vehicular roadway of the Bridge, then used orange netting to close off the entrance, thereby trapping the demonstrators on the Bridge. Despite obviously lacking the requisite intent or recklessness required under statute, and despite having themselves escorted the demonstrators onto the vehicular roadway, all of the demonstrators on the roadway were arrested and charged with violating Penal Law § 240.20(5).

e. <u>Long v. City of New York</u>, 11-CV-5125 (SAS) (S.D.N.Y.); Colin Moynihan, *Judge to Police: Relax About the "Weed Man,"* N.Y. Times, Dec. 20, 2011, at A32. Joshua Long was repeatedly arrested in Manhattan while lawfully begging and promoting tolerance of marijuana use and marijuana users. Mr. Long would regularly stand on a sidewalk, conscious of staying out of pedestrians' way, and hold a sign reading, "Help! I Need Money for Weed!" Even during the times Mr. Long was not arrested or issued a summons for violating Penal Law 240.20(5), he was regularly ordered by police to "move along" on the pretext he was allegedly blocking pedestrian traffic when, in fact, he was doing no such thing. Mr. Long moved for a preliminary injunction, a motion which was resolved when Mr. Long and the CITY entered into a stipulation, approved by this Court, which read:

> Defendant the City of New York, shall make best efforts to ensure that all New York City Police Department officers assigned to patrol within the territorial boundaries of the Midtown North or Midtown South Precincts (the "Area") will not order, direct, or otherwise communicate to plaintiff Joshua Long that he must move along, leave, vacate, disperse, or

otherwise remove himself from the area when he is standing lawfully and peacefully on a public sidewalk, holding a sign or otherwise communicating with passersby. The City of New York's best efforts shall include, without limitation, ensuring that the substance of this Order is communicated to all officers that work in the Area.

(*See* Docket Entry No. 31, Stipulation and Order dated December 19, 2011).

f. <u>Hardeman v. City of New York</u>, 11-CV-3424 (RJH) (S.D.N.Y.); Colin Moynihan, *After Panhandler Says Police Harassed Her, a Judge Tells Them to Stop*, N.Y. Times, Aug. 30, 2011, at A18. The plaintiff in *Hardeman* was repeatedly arrested on Fifth Avenue and charged with violations of Penal Law § 240.20(5) in response to her passive panhandling activity. Evidence submitted in support of Ms. Hardeman's application for a temporary restraining order and preliminary injunction against further arrests showed that, when she panhandled on Fifth Avenue, she occupied a mere 20 inches of a 16 foot wide sidewalk, which is only 5.2% of the width of the sidewalk. (*See* Affidavit of Sojourner Hardeman, Docket Entry No. 14-1). As a result of the Hardeman litigation, the Court approved of a stipulation which resolved the TRO application, as follows:

   i. The NYPD agreed to re-train members of the Midtown North Precinct by reading the following command at roll call several times per week for several weeks: "The Department reminds you that... New York Penal Law 240.20(5) requires a <u>***real***</u> obstruction of vehicular or pedestrian traffic." (*See* Docket Entry No. 17) (emphasis added).

   ii. The City of New York agreed not to arrest or issue a summons to Ms. Hardeman "absent probable cause that she has engaged in criminal activity or committed a criminal offense or violation." (*Id.*)

Given that the City of New York had a pre-existing obligation not to arrest Ms. Hardeman without probable cause, the stipulation resolving the TRO application is a tacit acknowledgment the NYPD had repeatedly misapplied Penal Law § 240.20(5) against Ms. Hardeman as she engaged in passive panhandling, an activity which is clearly protected by the First Amendment.

g. <u>Reshke v. City of New York</u>, 11-CV-2198 (AKH) (S.D.N.Y.); <u>Ferracane v. City of New York</u>, 11-CV-6992 (AKH) (S.D.N.Y.). Members of the NYPD's Gang Intelligence Unit made scores of arrests at the 2010 Puerto Rican Day Parade of persons engaged in First Amendment activity by gathering and celebrating their cultural heritage in New York's largest annual parade. The police made these arrests upon the pretext such persons were blocking pedestrian traffic at the parade and for the sole purpose of interrogating the arrestees about suspected links to local gang activity. All fourteen of the *Reshke* and *Ferracane* plaintiffs had their criminal charges dismissed, most of them on the grounds of the facial insufficiency of the allegations to support a charge of Penal Law § 240.20(5).

h. Acevedo v. City of New York, 10-CV-514 (HB) (S.D.N.Y.). Same as *Reshke* and *Ferracane*, except the eight *Acevedo* plaintiffs were arrested at the 2009 Puerto Rican Day Parade.

i. Callaghan v. City of New York, 07-CV-9611 (PKC) (JLC) (S.D.N.Y.). All of the *Callaghan* plaintiffs were arrested, some of them multiple times, in retaliation for their participation in Critical Mass bicycle rides on the last Friday of every month, activity which this Court has held is expressive conduct within the meaning of the First Amendment. Many of the *Callaghan* plaintiffs were arrested while lawfully riding their bicycles on City streets, and many of those people were charged with violating Penal Law § 240.20(5). The *Callaghan* plaintiffs alleged that they could not have been "blocking" traffic because, as cyclists obeying relevant traffic laws, they *were* traffic.

j. Dunlop v. City of New York, 06-CV-0433 (RJS) (S.D.N.Y.). The plaintiff in the *Dunlop* matter was arrested while observing arrests of Critical Mass bicycle riders (*see supra*) during the 2004 Republican National Convention and was charged with violating Penal Law § 240.20(5), despite the fact there was no traffic at all around him at the time of his arrest. The act of observing arrests occurring in public is activity protected by the First Amendment, yet the police disregarded Mr. Dunlop's rights and wrongfully arrested him even though there he was not even arguably blocking vehicular or pedestrian traffic.

k. MacNamara v. City of New York, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.). The *MacNamara* plaintiffs' cases were consolidated from no less than 44 civil cases related to the over 1800 arrests at the 2004 Republican National Convention. Nearly all of the *MacNamara* plaintiffs were engaged in lawful activity protected by the First Amendment, but, despite that fact, hundreds of them were arrested for violating Penal Law § 240.20(5) when they were not actually blocking any traffic whatsoever. *See MacNamara v. City of New York*, 275 F.R.D. 125, 135 (S.D.N.Y.2011).

l. Bandele v. The City of New York, 07 CV 3339 (MGC)(S.D.N.Y.) The plaintiffs -- Lumumba Bandele, Djibril Toure and David Floyd -- say they were arrested while videotaping two arrests in Bedford-Stuyvesant, Brooklyn, on February 9, 2005. "In trying to stop the police from violating the rights of others, they had their rights violated," said Kamau Franklin, a lawyer with the Center for Constitutional Rights. *Metro Briefing: New York; Manhattan: Lawsuit Against The Police*, The New York Times (April 27, 2007), http://query.nytimes.com/gst/fullpage.html?res=9C02E2DD123EF934A15757C0A9619C8B63.

m. Carneval v. The City of New York, 08 CV 9993 (DAB)(AJP)(S.D.N.Y.) A Manhattan photographer was arrested after filming NYPD officers in the East Village as they seized and loaded bikes, which had been locked to lampposts and parking meters, into a police van. After the photographer began filming and discussing the removals with another man, a plainclothes officer asked him for identification. When the photographer stated he had the right to film, the officer led him to a police car,

9

examined his ID, then arrested him. Colin Moynihan, *City Settles with Two Arrested After Police Confrontation*, The New York Times (March 31, 2010), http://cityroom.blogs.nytimes.com/2010/03/31/city-settles-with-pair-arrested-after-police-confrontation/.

n.  Thirteen news organizations sued the NYPD for its treatment of journalists covering the Occupy Wall Street demonstrations, specifically, the arrests, detention and mistreatment of photographers and reporters covering the demonstrations. In addition, 10 press clubs, unions and other groups called for an investigation and formed a coalition to monitor police behavior going forward. Brian Stelter, *News Organizations Complain About Treatment During Protests*, The New York Times (Nov. 21, 2011), http://mediadecoder.blogs.nytimes.com/2011/11/21/news-organizations-complain-about-treatment-during-protests/.

o.  Photographer Robert Stolarik, 43, who worked regularly for The New York Times for more than a decade, was charged with obstructing government administration and with resisting arrest after taking photographs of a brewing street fight at McClellan Street and Sheridan Avenue in the Bronx. Mr. Stolarik was taking photographs of the arrest of a teenage girl about 10:30 p.m., when a police officer instructed him to stop doing so. Mr. Stolarik said he identified himself as a journalist for The New York Times and continued taking pictures. A second officer appeared, grabbed his camera and "slammed" it into his face, he said. *Times Photographer is Arrested on Assignment*, The New York Times (Aug. 5, 2012), http://www.nytimes.com/2012/08/06/nyregion/robert-stolarik-times-photographer-is-arrested-while-on-assignment-in-the-bronx.html?_r=1.

p.  Five photojournalists reporting on Occupy Wall Street protesters were arrested in course of their reporting. One photographer was arrested after attempting to take a picture of an officer giving a dispersal order on a sidewalk. Another was forced to the ground and detained, while another was shoved and blocked from taking a photo by a Lieutenant in the NYPD's Legal Bureau. Christopher Robbins, *NYPD's pattern of harassing, arresting journalists continues*, Gothamist (Sept. 19, 2012) http://gothamist.com/2012/09/19/nypds_harassment_of_journalists_con.php.

q.  A Brooklyn photographer was arrested and his pictures destroyed by NYPD officers after he filmed them stopping and questioning teenagers in Flatbush, Brooklyn. The National Press Photographers Association announced its interest in filing against the NYPD for the arrest. Sandy Eller, *Charedi Photographer Claims Handcuffed by NYPD After Videotaping Flatbush Police Stop*, Vosizneias, (Jan. 20, 2013), http://www.vosizneias.com/122118/2013/01/20/brooklyn-ny-charedi-photographer-claims-handcuffed-by-nypd-after-videotaping-flatbush-police-stop/.

r.  Two Harlem residents were arrested after they filmed NYPD officers conduct stop-and-frisks at a car checkpoint. Christina Gonzalez, 26, and Matthew Swaye, 35, said they were returning from a Bronx mall at about 10:30 p.m. Thursday when they

noticed several vehicles stopped and Gonzalez took out her camera to begin filming. Jeff Mays, *'Professional Agitators' on NYPD 'Wanted' Flier Arrested After Filming Stop*, DNA Info (May 21, 2013), http://www.dnainfo.com/new-york/20130521/central-harlem/professional-agitators-on-nypd-wanted-flier-arrested-after-filming-stop.

s. On June 20, 2013, NYPD officers arrested a photographer taking photographs of a Bushwick police station when he refused to tell the officers why he was taking the photographs. Shawn Randall Thomas was given two summonses for disorderly conduct. He has filed a complaint against officers alleging abuse and corruption. Meredith Hoffman, *Photographer Arrest Taking Pictures of Police Station House*, DNA Info (June 20, 2013), http://www.dnainfo.com/new-york/20130620/bushwick/photographer-arrested-taking-pictures-of-police-station-house-bushwick

t. NYPD officers arrested a Bronx teenager after he was filming the officers attack and threaten two young girls in a Bronx park. The teenager told the officers to leave the girls alone and began filming them with his phone. The officers began chasing him, tackled him and punched him before arresting him. Jennifer Cunningham, *Teens say they were beaten by cops in Bronx park*, New York Daily News (Aug. 29, 2013), http://www.nydailynews.com/new-york/bronx/teens-mauled-cops-article-1.1440394#ixzz2eVh68jgw.

u. People v. Alicea, 00012-2013 (Sup. Ct., N.Y. Co.) (NYPD sergeant convicted of 10 felony counts of filing a false document and one misdemeanor count of official misconduct, for falsely swearing he observed two men engaged in a drug transaction, when video evidence clearly showed that the two arrestees had no contact; in response to the indictment, Manhattan District Attorney Cy Vance stated "We rightfully trust our police officers to report their activities truthfully. Those who do not erode the public's trust in law enforcement... To falsely accuse anyone of a drug sale is not only unacceptable, it is a crime.");

v. People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but

even more distressingly by the seeming casualness by which such conduct is employed");

w. <u>Lin v. City of New York</u>, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[1]

x. <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on <u>Iqbal/Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

34. The existence of the above-described unlawful <u>de facto</u> policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, then Commissioner Kelly.

35. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned <u>de facto</u> policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves of their fellow officers, supervisors and/or

---

[1] For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

subordinates. They do so with the knowledge and approval of their supervisors, commanders and then Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

36. All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraph 27.

37. Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution.

38. Defendant CITY is directly liable and responsible for the acts of the individual police defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

39. Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Then Commissioner Kelly, have not taken steps to terminate these policies, practices and/or

customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

40. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to exercise unreasonable and wholly unprovoked force against plaintiff, arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up their blatant violations of plaintiff's constitutional rights. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights or subsequent perjury.

41. Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

42. The actions of the individual police defendants resulted from and were taken pursuant to the following de facto policies and/or well-settled and widespread customs and practices of the CITY and of the knowing and repeated failure of the CITY and the NYPD to properly

supervise, train and discipline their police officers in meaning and lawful scope of Penal Law § 240.20(5), particularly where applied to activity protected by the First Amendment.

43. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

## JURY DEMAND

44. Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

WHEREFORE, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a. That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b. That he be awarded punitive damages against the individual defendants; and

c. That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d. For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         February 20, 2014

Respectfully submitted,

By: _____
David B. Rankin
Rankin & Taylor, PLLC
*Attorneys for the Plaintiff*
11 Park Place, Suite 914
New York, New York 1007
Ph: 212-226-4507